Good morning. Please have a seat. Thank you all for being here this morning. Can we call our case, Ms. Taylor? 131097, Eagle Grove, Bryan v. Buchanan. Counsel, will you please step up? And would you please identify yourselves and tell us who you represent? Michael Orenstein, State Appellate Defender, representing Defendant Von Bryan Buchanan. Good morning, Assistant State's Attorney Brian Levitsky on behalf of the people of the State of Illinois. All right. And you are it this morning. Our panel is not real strict about time limitations. We won't hold you to that. But I'll tell you, we have read the briefs. We're familiar with the issues. So, Mr. Orenstein, how much time would you like? Ten minutes and probably about. Sure. Mr. Levitsky? Yeah, I believe we would expect 10 to 15 minutes. Okay. And as you both know, the microphone that's in front of you is for recording purposes only. It's not for amplification. So if you'd keep your voices up, we'd appreciate it. And I'd suggest focusing on your first issue. We won't preclude you from arguing all of the issues that you've raised. And with that, Mr. Orenstein? May it please the Court, Counsel? This Court should reverse because Counsel has no specific professional obligation with any potential, let alone a serious potential, to hurt Brian Buchanan. First, this Court should credit the trial court's finding that senior and juniors, as the State calls them, were not partners. In fact, they were exemplary with approvals of professional responsibility, say a firm is not. They shared office space with themselves and other lawyers. They occasionally worked together. And they occasionally requested continuances from each other. And they told Counsel a grand total of three cases. Surely this is occasionally assisting under Rule 1.10. And they were not. What this rule says a firm is not. Nothing in the record, or they were what the rule says they're not. Nothing in the record suggests that they had mutual computer systems. Nothing in the record suggests that they had mutual file drawers. Nothing in the record shows that they held themselves out as a firm, common letterhead, anything like that. Well, when senior shows up on several court dates in this case, just looking at this case for the time being. Right. And explains why junior is not there. Yes. And then talks to the family. Would the family understand that they're together and holding themselves out as a firm? Well, the family, I can't tell you what the family subjectively understands, but I can tell you that when senior testified, he said when he talked to the family, he talked about why junior wasn't there. He didn't talk about the issues of the case. He didn't talk about anything related to the case. So the things he was talking about related to logistical things, not things that would indicate that he was working on their case or he was involved in their case. So the other thing is that the record does show that he did not keep a joint account. So our argument is that they were not a firm. Since they were not a firm, junior had no specific professional obligation against his client's interests. Now the state argues that senior, as junior's dad, could have given junior confidential information. This argument fails for three reasons. First, it doesn't create a conflict of interest. Senior has no duty to Gambrel, and he has a duty to his client. Secondly, it misreads a comment that it cites. Comment 11 from 1.10 talks about father or close relatives who represent another party. Senior did not represent a party. Senior represented a witness. And third, the whole idea that senior gave junior confidential privilege information, I should say, is purely speculative. Now the state also argues that junior couldn't have effectively done a direct examination of senior. Well, we feel that of course he could have. Senior would have asked, junior would have asked senior if he represented, if he remembered a single statement from a single police interview, he would have said no. All that testimony was locked in in the pretrial hearing. This is no different than the state putting on a felony review assay or the defense putting it on their investigator. Can I ask you something, Mr. Orenstein? Sure. My recollection of impeachment is if a witness says something, the police officer or the ASA says, this is what Gambrel said in her statement to the police. Right. And senior takes the stand and says, I don't remember that. Not that she didn't say it, but I don't recall her saying that. Is that impeaching? Well, it depends how you look at it. If you say I don't remember whether or not she said it, then it would not be impeaching. If it's in context I remember the whole conversation and I don't remember that piece of it, then I suppose it might be impeaching. I don't think it's strong impeachment at any rate. I don't think it's much impeachment. I guess it's because I don't think it's strong impeachment. So, again, senior was already sworn in at the motion hearing, and junior would have risked nothing and certainly nothing hurting him or his client by having senior repeat his testimony at trial. So there wasn't any professional obligation, so there was no conflict of interest, and there was no reason for this court to go any further. But if this court does go further, even if there was a conflict of interest, it would have been an abuse of discretion to remove junior. My client's interest in keeping junior was high. Junior was his longtime lawyer, a lawyer who had worked for him before. That's why he wanted to keep him, and that's probably why the state wanted to remove him. Now the state's interest, or at least a legitimate interest, in booting junior was low. The state argues, again, that senior might have spilled Gambrel's secrets. But the state fails to even ask Gambrel or ask senior if Gambrel had waived privilege for any of this stuff. So on that level, there's no problem. Further, the state found that senior had, up until that point, I mean the state, the trial court found that senior had, up until that point, done nothing improper. So it would be purely speculative to find that for some reason something would switch, and all of a sudden he would be spilling his client's secrets. And don't forget how tangential a witness senior would have been. He would have been called to deny, as he said, a single statement of Gambrel's, or say he couldn't remember a single statement of Gambrel's. So the state faced no risk to a fair trial here. Now as far as the appearance of propriety, I think the state's argument pretty much repeats itself, and I'm going to quote the three lines of it. If the jurors learned that senior represented Gambrel while junior represented defendant, they may have been able to speculate that junior used his family connection with senior to gain proper information. So you've got three levels of speculation there. And I don't think that that's enough to deny my client his fundamental right to counsel of choice. I would also argue that the state did not bring this motion in good faith. Initially, it assumed that senior would corroborate the police and the state's attorney and a grand jury transcript. Well, this is not something that just goes on at 26th and California. When the state wants to impeach a witness with a private statement, and they have both a prosecutor and a detective ready to do that, I don't think it's logical to say that they would be bringing in the defense attorney, too. And certainly they would have no need to corroborate the grand jury transcript with senior's testimony. So unless there are any other questions, I would ask this Court to reverse Buchanan's conviction. Well, on the second point there, is the appearance of impropriety something that we use to disqualify lawyers? The appearance of impropriety cannot be used in the determination of whether there's a conflict of interest. So in other words, if there's no conflict of interest, you don't get to appearance of impropriety, because you don't get to the second prong. Now, there is some case law saying appearance of impropriety is relevant to the second prong if you find there is a conflict. Now, I would argue it should be at an extremely low rate and be a very tangential point, because I've cited several out-of-state cases, all of which collect other cases, talking about how, under Gonzalez-Lopez, this is really a fundamental constitutional right, the right to counsel. This is, you know, a Scalia originalism special. The right to counsel in the Sixth Amendment assumed a specific, or the right to a fair trial assumed a specific vehicle for that right, which was the right to counsel of choice. And to say that somebody has a perception that that's improper really should bear hardly any weight at all. I mean, some people may think it's a perception that it's improper, and I'm arguing here that taxpayer dollars should be canon. But that doesn't mean that it shouldn't be doing it. So I think it should receive no weight on the first prong. It should receive very little weight on the second prong. All right. Anything else? All right. Thank you very much. All right, Mr. Levitsky. Good morning again, and may it please the Court. This isn't a case that's just about sharing office space and printers and secretaries. This is a case where the evidence before the Court is that we had two attorneys who were working very closely together during the investigation of a first-degree murder. Other than the fact that Senior said he discussed Gambrell's interview with the State's attorney and the police with Junior, what other evidence is that they were working very closely on this investigation? Well, if we – and I know this Court is familiar with the record, but just to recap some of the evidence that's in the record, first the people filed their motion alleging that someone claiming to be the defendant had called the Illinois State police and then called homicide detectives. Then we have the statement that Ms. Gambrell made to the police and to the assistant State's attorney that was admitted at the hearing on that motion, People's Exhibit 1, where Ms. Gambrell says that the defendant told her the dude ran his car off the road and that he called the Illinois State police, and they informed him that he had to call homicide detectives, and then he left. There was another exhibit, People's Exhibit 2, that was the transcript from the grand jury, where Ms. Gambrell testified differently. What she said at that point – Okay, tell me how it's different. Right. So what she says is the defendant didn't say who it was, didn't say that it was the dude like you previously said, that she told him to call the Illinois State police and that she – after that he left. So she testified that she didn't remember. Let's focus on the grand jury testimony. My recollection of her grand jury testimony is she was asked, did Buchanan tell you that the Illinois State police had called him? And she said, I don't recall him saying that. The comment I recorded, 201, do you have a conversation with him about the car that was not on Route 88? Answer, well, I just told him that I didn't see it. Question, I didn't answer, I told him to call the State police. It was something to see if they towed the car and he left. Question, did he tell you whether or not he had received a call from the State police? Answer, no, he didn't say, I don't remember him saying that. How is that inconsistent with her statement to the police where she said, he told me he had called the Illinois State police? Because what it does is it casts doubt on the earlier statement that there was the contact with the Illinois State police. Cast doubt? I mean, well, the State's premise is she's recanting in the grand jury. When the question – when her statement in – her statement to the police is, Buchanan told me he had called the Illinois State police and they told him to call homicide detectives. That's what she said to the police. And in the grand jury, the question that she's asked is, did he tell you that the Illinois State police called him? What's – when she says no, I don't recall him saying that, what's inconsistent there? I think what's inconsistent is it gets to – I mean, it wasn't just about who called who. It was about whether the conversation took place. And I think that if we – this wasn't just a conversation about who called who with the Illinois State police. She also told the detective and the assistant state's attorney in the interview about Illinois State police saying that he had to call homicide detectives. And then at the grand jury question, did he ever tell you whether or not Chicago police detectives were looking for him? Answer, I don't remember if he told me right then. I don't remember. Okay. So, again, could you tell me how that's inconsistent? Because in her statement to the police, she doesn't say, Buchanan told me the police are looking for me. He said, in her statement to the police, that I called the Illinois State police about my car that was in the ditch on I-88, and they told me to call homicide detectives. He never said, which tells me that the police are looking for me. I think part of the inference is that if the Illinois State police told him that you need to call homicide detectives, that they know of some reason why he should do that. That's a pretty big inference to disqualify a lawyer. Well, it's not simply those particular inferences. Again, I haven't heard one syllable from you that would indicate that that's impeaching. Trial ad 101. Your Honor, what we have here, again, we have to look at the timeline of when these statements were made, though, and I think that gets more to the heart of this issue. When Ms. Gambrel spoke with the detective and with the assistant state's attorney, she did so only on the condition that the defendant's father would be present during that conversation. What did the state ask Gambrel about the content of her conversation with Buchanan the morning after the murder at trial? I mean, at trial, it didn't focus on those particular messages. What did they ask about that conversation at trial? The answer is nothing. Right. They focused on simply the evidence of flight. So doesn't it look like they set the trial floor up? Excuse me, ma'am. You're welcome to be here. We don't have people in the audience nodding their head. Okay. Thank you. Sorry. Looking again at the timeline of when these different statements were made, Sam Adams Sr. was with Ms. Gambrel when she makes that statement to the police and to the assistant state's attorney. In January of 2008, the defendant is found when he is a passenger in Ms. Gambrel's car. Then if we look again at the grand jury hearing, Sam Adams Sr. was present for that again. Again, it was a condition. She said on February 1st that she would appear and testify if her attorney was there. Again, when Sam Adams Sr. was present, she gives a statement, and we can maybe disagree about how impeaching the different statements were, but they were different statements. And if we look then at what Mr. Sam Adams Sr. said at the hearing on the motion, what he said was that he was representing Ms. Gambrel as of that first interview, and he told his son about that. He testified that he didn't recall Ms. Gambrel saying that the defendant said he called her and told her that he called the police and they informed him that he had to call the homicide detectives. He said that after reading the transcript from the grand jury, that he doesn't recall those conversations taking place with the police officer and the assistant state's attorney. So how many cases have you seen where if the state needs to impeach a witness with an inconsistent statement that was witnessed by a state's attorney, a police detective, and a defense attorney, or I shouldn't say a defense attorney, an attorney representing the witness, that the state has elected to call the attorney representing the witness over an assistant state's attorney or a police detective? Your Honor, I know that it does happen. I don't know how many times. I'll tell you, Mr. Levitsky, I've never seen it. Your Honor, I think if you had the choice as a matter of trial strategy to call an assistant state's attorney or detective as the prosecution versus that witness's attorney, it would be logical to call the attorney because you wouldn't have to anticipate an argument by the defense that the state is using its police and its- Trial lawyers would rather call a witness that they won't be able to interview or prepare over witnesses that they can. Your Honor, in this case, we knew that Mr. Sam Eden, Sr. was present at the conversation with the police and with the assistant state's attorney on September 9th. I'm sorry, on September 12th, 2007. And it would be reasonable to believe that if he were called to testify on the situation where they had to impeach Ms. Gambrill, should she be called and testified consistently with her grand jury testimony, that he would have testified consistently with what was in the police report. So by the time of the hearing on the motion to disqualify, then the state knew that wasn't going to happen. Sr. said, I don't recall her saying that. It was- So then the theory of disqualification changes. And it says, well, maybe we won't call him, but Buchanan will have to call him. Well, Your Honor, at that point, after Mr. Sam Eden, Sr. said that he didn't recall those statements being made, there was a question if Ms. Gambrill would testify consistently with the grand jury testimony or if she would testify consistently with what was in the police report. And depending on whether if she testified consistently with the grand jury statement, then the people might be in a position to call Sam Eden, Sr. to- But they knew, they conceded after the hearing on the motion to disqualify that they weren't going to call him because he wasn't going to impeach her. He didn't recall her statement. He didn't recall her making that statement to the police. And so in argument, after the hearing, the State said, now we think the defendant is going to have to call Sr. Right. And that will give rise to the appearance of impropriety. And it would if the jury knew that the- the jury would then learn in that case that the defendant's attorney's father was representing a prosecution witness within days after the inception of this case while the defendant was still missing. And it could have come out that at the hearing that Sam Eden, Sr. said that he told Jr. the questions that were asked at the grand jury hearing that- There was never any suggestion that he did that. It would be unethical, right? Grand jury, I'm surprised he was even in the grand jury. I've never seen a case where a lawyer was in a grand jury. But those proceedings are confidential. He can't reveal the content of that. Yes. Go ahead. I'm sorry. But at the hearing on AA35 to 36, question, after the appearance, her appearance before the grand jury, did you have a conversation with your son regarding what she had said during the course of her appearance before the grand jury? Answer, I believe so, no. I don't think so. Then later he says, I may have told him. Let me think now. I think I did tell him that she had said substantially what she had said before the assistant state's attorney. Excuse me. It's those two conversations that Sr. had with Jr. that are the most troubling to me because he's acknowledged that he briefly told Jr. what the ASA and cops asked her in that interview and what her statement was. And then he's acknowledged that he said to Jr. that Gambrel said about what she said to the police in the grand jury, which he's a witness for the state. I'm having a hard time seeing why he was talking to Jr. about any of it. That is what's concerning. And I think even though the trial court said and the people didn't allege in their motion that there was a specific instance of unethical conduct, if we look at the entire record, what we do have here, again, is two attorneys who are sharing information about each other. Again, this isn't about whether or not the rules would allow attorneys to talk shop about cases. They're sharing information from different sides of the case. Right. They're not on the same side. They're sharing information from different sides of the case, but it inures to the defendant's benefit. But nothing about the interview that Ms. Gambrel had with the police and the ASA is confidential, right? There's nothing that precludes Sr. from telling Jr. what the police asked her, right? Well, let's look at the timing, though. He's telling Jr. what the police asked her before anybody has a copy of the transcript of that statement. And was it before she went to the grand jury? The conversation with the police was September 12, 2007. The grand jury hearing wasn't until February 5, 2008. So Sam Adams Jr. was receiving information through Sam Adams Sr. According to Sam Adams Sr., in September of 2007, when, again, the defendant's whereabouts were totally unknown, and later on, when Ms. Gambrel testifies and Sam Adams Sr. is sitting in the room, which is, again, an unusual instance, she says something differently. And, again, it's the conversations about the phone call that matters, because remember what happened in this case. The wild 79 car was missing on Route 88, and the allegation was that someone named Brian Buchanan was calling the ISP, and they told him to call homicide detectives. Then if defendant told Ms. Gambrel that he was having some communication with the ISP and he knew that he had to call the homicide detectives, and that's coming from Ms. Gambrel, who could identify him, that links defendant to the phone calls, that links him to the car, that links him to the crime scene. So these were – But at trial, she was never asked that. She wasn't. We had the – and I can't answer why it wasn't presented as additional evidence, but we were able to link defendant to the crime scene through the registration of the rental car and through our eyewitness testimony. But it would have been additional evidence. And it was crucial at this point to understand how defendant was initially. Was there testimony from the Illinois State Police that an individual identifying himself as Brian Buchanan called about that car in the ditch? Your Honor, there was a motion by the defendant prior to the motion to disqualify to suppress those statements on hearsay and foundational grounds. It's my recollection that there was a detective or testified, but I can't recall at this point, and I apologize whether or not anyone from the Illinois State Police testified to that effect. But even if that evidence wasn't used at trial, I think it was relevant to the question of whether or not we've shown that under Rule 1.10 that there's – we can impute the existence of a firm between these two attorneys, is that at the time, it seemed like it was extraordinarily relevant information, how he tied the defendant to the crime scene. And that was information – When would that have been apparent to the State? When would the importance of this evidence have been apparent to the State? Your Honor, I can't speak to a timeline. I don't know when the people were able to finish their investigation that would have led to the additional information about the registration. She spoke to the police in September. She testified before the grand jury in February. If there's an inconsistency in her testimony on this critical conversation, wouldn't it have been apparent then? Your Honor, the – it certainly could have been apparent. And so the State – by February, the State knew that Junior was representing the defendant and Senior was representing Gambrill. That is correct. So a year and a half goes by before this motion to disqualify is filed. Why would that be? Your Honor, the – I can't speak – I understand that there were different – state's attorneys were handling the case between the time. I don't know if it was a matter of professional judgment to proceed one way versus another or if it was simply that the necessity of that information at trial became an issue, if there were any problems with reaching out to – So it's okay for them to sit on it for a year and a half and then use it to disqualify the lawyer and then not talk about it at trial with the witness? Your Honor, I think if we're in the pretrial state and this is what the – I mean, what Ortega says, quote, unquote, is that the likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those fairly familiar with criminal trials. And Wheat says that the trial court must pass on the issue of whether or not to allow a waiver of conflict. But I think in this case the same logic applies to the issue of disqualification. By a criminal defendant, not with the wisdom of hindsight after the trial has taken place, but in a murkier pretrial context when relationships between parties are seen through a glass darkly. And so we're not simply – I'd give you that if the state filed its motion a year before trial, still doing an investigation. I'd say it's hard to predict. But we're talking about a motion that was filed a month before trial, after the trial date had already been set. Yes, I think, again, the trial court, again, did specifically consider the Ortega factor of whether or not there was any overreaching in this case, which I think is maybe the concern that this court is expressing by not filing the motion sooner. And it did not find that there was any overreaching in this case. The trial court, which was aware of the timeline and presided over the motion to disqualify and the prior motion to bar the admission of those conversations that the defendant had filed. And so I think that the trial court, which is in a position to gauge the realities of the timeframe and whether or not there was overreaching, did act within its discretion in finding that there wasn't any. Excuse me. The state knew that Junior was representing the defendant from a pretty early stage in this. The shooting, again, happened on the 19th. And after the phone call with the detectives, the motion was alleged that the detectives received a phone call from Junior. And when Senior shows up with the witness, Senior is sitting there with the witness, the state's witness. Correct. So they were aware that Senior and Junior were both involved in this case on different sides pretty early on. Yes. And then they let Senior sit in on the grand jury. Is that the way things are normally done? No, again, this was a very unusual case, both because of the fact that the father and the son were representing the defendant and the prosecution witness, and because of the repeated insistence from Ms. Gambrel that her attorney be present for the conversation early on and for the grand jury. She didn't show up a couple of times, right, because she didn't have her attorney ready or something? February 1st was the original subpoena date for the grand jury, and then I believe she said something to the effect that she wanted to be there with her attorney, and so it was held over until February 5th. So the state knew that Junior and Senior were involved with different people from different sides of this case early on, but they didn't know that Senior had talked to Junior on two separate occasions about what this witness said until the actual hearing on the motion. Indeed. And the substance of that testimony came from the trial court's questioning of Mr. Sam Adams, Senior, not from the people's questioning. I think. Thank you. And again, in addition to all the information that was shared, which informed Junior about the course of the investigation and the fact that between the interview with the police and the NSA and the grand jury testimony where Ms. Gambrill gives different statements, again, the trial court found and wasn't alleged that there was a specific instance of unethical conduct, but looking at this record as a whole, the evidence shows that there was at least enough to show a substantial risk of a conflict of interest. These two attorneys were working together as law partners in everything but name. And again, even if we look at the other evidences before the court regarding the office, it is significant, for example, that even though Sam Adams Senior says that he has a different office, I mean, where does he go for that initial meeting with Ms. Gambrill before the police? He meets her at the 6133 South Ellis office, which he says isn't his main office, but that's where he's meeting the prosecution witness and they haven't run into Sam Adams Junior. And so the trial court properly exercised its discretion in finding that there was a serious conflict, that it would involve a specific professional obligation, and after finding that it properly weighed the Ortega factors and finding the defendant's interest in having Mr. Sam Adams Junior continue to represent him was outweighed by those factors. And if we look at the people's right to a fair trial, I think that's certainly a factor that was implicated in this case, where Senior was telling Junior we can believe about the course of investigation based on the different testimony that was provided at the grand jury. And as Ortega noted, a reasonable person could conclude it would be seriously unfair to the people if information received from a witness to cross-examine the witness or to otherwise mount their defense. And so what we had here was a case where Ms. Gambrell potentially would have been called to testify, that her attorney would have potentially been called to testify, and that Sam Adams Junior would then be in a position to either conduct a direct or a cross-examination based on what that testimony was. And it would have been after he had received information, which was undiscoverable at the time, about the course of investigation, about different statements that she made, from someone who was effectively his law partner, even though that information should have been confidential. Again, the court found that there was an appearance of impropriety in this case. It would have come out that Sam Adams Junior and Senior were father and son. It would have come out that early on in the inception of this case, that Junior was representing defendant and that Senior was representing prosecution witness, and the jury would have heard that that prosecution witness was with the defendant when the defendant was found and would have heard about the information that Sam Adams Senior had presented during that hearing  and that would have been mirrored against the defendant. He would have been prejudiced if the jury knew of everything that was going on, because then it could have made the inference that there was a potential for unethical conduct, even if the trial court found that there wasn't. Again, and these are two factors, the people's interest in a fair trial and the appearance of impropriety, which even though the defendant had provided a waiver of any conflict of interest, Ortega found at 370 that these factors cannot be waived. Additionally, a factor to consider is the probability that continued representation by counsel would provide grounds for overturning the conviction, and had Sam Adams Junior continued to represent defendant at trial, then we could very well be having a conversation here today about whether or not there was a conflict of interest based on the concurrent representation by Sam Adams Junior and Senior. Okay. Let's wrap up, Mr. Levitsky. In closing, I would just ask this Court to consider the substantial latitude that trial courts are afforded in these cases because of the pretrial nature of trying to predict the way that these proceedings are going to go, the information that was available to the trial court at the time, and even though we have discussed some matters that weren't specifically considered by the trial court, this Court knows that it can affirm on any evidence that's in the record. And for those reasons and the reasons stated in our brief, we would ask this Court to affirm the defendant's conviction. Thank you. Thank you. All right, Mr. Orenstein. Thank you, Your Honor. There's two points. The first point relates to your point, Justice Kuczynski, about the references of the grand jury and what Senior might have said about the grand jury, and also states repeated references to Junior and Senior working together and sharing information. Now, you could certainly read Senior's testimony and say that he said something that maybe he shouldn't have said that was improper about the grand jury, but the trial judge found that Senior did nothing improper. So we have that finding of fact. The second point is even if Senior did say something you shouldn't have said about what went on in the grand jury, that is something Senior did that may have impinged on his client's rights. It does not create a conflict of interest as to my client. My client is represented by Junior, and Junior has no obligation to Gambrel to defend her grand jury rights. The other point about that is the state says three times they're working closely together, they share information. There is nothing in the record, nothing even hinting, even behind the inference speculation, that Junior shared any information with Senior, that he did anything improper. There's only one thing in the record that Junior did in the motion, and that is Junior saw Gambrel come into the office. He said, hello, I'm sorry, I can't be here. I have to leave. So there's no indication that Junior did anything that would begin to create a conflict of interest, and Senior can't create a conflict of interest on Junior's part. The only other point is the state quoted Ortega in a language about relationships and looking through a glass document, and they mention that at several points in their briefs. The language in Ortega, and I believe in Wheat, which Ortega quoted, was, relationships are looked at through a glass document. The reason they talk about relationships is those cases involve joint representation by a single defendant, and the relationship issue is you never know if one defendant is going to flip at the last second on the other. Here, the relationships are not looked at through a glass document. We know exactly what the relationship is by their father and son. They have a close personal relationship, and we also know that Junior's testimony, Senior's testimony, was locked in. He testified. There was no question about what he would have said if he was called to trial. So there's nothing to look through a glass document in this case. So unless there are questions, yes. I do have a question. You're telling us that Senior might have said something to Junior, but Junior didn't do anything wrong, but Junior was part of that conversation. Junior didn't turn on us. There's no testimony that says the minute Senior started to talk about the grand jury, Junior said, stop, and walked away. They had the conversations, two of them. Well, there's no testimony that he did walk away. There's no testimony that he didn't walk away. There's no testimony what he did. And the state here bears the burden of proof. The state has to show. Senior said. I told him. And Junior. What do we get from that? We get from that that Senior may have, although he's going to try to otherwise, done something improper. We don't know what Junior did. And even if Junior did do that, Junior is perhaps, even if Junior said, tell me more, tell me more, Junior is perhaps unethically, but acting in his client's interest, and that might go to the second prong, but it does not create a conflict of interest because it is not against Buchanan. It's in favor of Buchanan's interest. I mean, I'm in trouble with the ARDC. Here's the construct I'm having a little trouble with. We keep talking about a conflict of interest, and a conflict of interest is where they're both talking about people from different sites. And I apologize because I used that analogy earlier. And in thinking about it, they're defense attorneys. So for us to believe for a moment that Sam Senior was working on behalf of the state I think would be unreasonable. So he's representing a state witness in a case in which the state witness had a relationship with the defendant. Right. And they had a job together. They had lived together. They shared a car together. So I'm not sure that conflict can even be used in that context. Because Sam Junior and Sam Senior, looking at it from the outside, probably could never have been in conflict on that. They both would have been in conflict with the state. Okay. So the conflict of interest is from the state's point of view whether or not Sam and Junior ever discussed this case, which Sam has acknowledged they did on two separate occasions. Yes. And that answer is rather to the second, to Ortega's second prong, because if there's a risk they're acting unethically, then that could deny the state a fair trial. I think the risk is extremely minimal for the reasons I mentioned in my brief. But you don't even get there under Ortega, and I think under Wee, unless defense counsel has a specific professional obligation against his client's interests. Under Ortega, that question, as I read it, does not even come up. And for those reasons, I would ask that this Court reverse the conviction. Thank you. Thank you. Thank you very much. Thank you for your excellent briefs. And the arguments here today will take the matter under advisement. Thank you.